Willie L. MORROW and Jerome Mangum, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

W. O. DILLARD, Commissioner of Public Safety of Mississippi, et al., Defendants.

Civ. A. No. 4716–N.

United States District Court, S. D. Mississippi, Jackson Division.

March 31, 1976.

As Amended April 12, 1976.

Frank R. Parker, Jackson, Miss., for plaintiffs.

Charles A. Marx, A. F. Summer, Atty. Gen., State of Miss., William A. Allain, Special Asst. Atty. Gen., Jackson, Miss., for defendants.

## POST–REMAND MEMORANDUM OPINION

NIXON, District Judge.

This remanded racial discrimination case, which involves employment practices of the Mississippi Highway Patrol (MHP) as well as the entire Department of Public Safety (DPS) of which it is a part, is before us pursuant to the mandate of the Court of Appeals for the Fifth Circuit (en banc) 491 F.2d 1053 which affirmed this Court's finding that the Highway Patrol has historically engaged in unconstitutional discrimination in its employment practices, but found insufficient our decreed affirmative injunctive relief to eradicate or eliminate the effects of past racial discrimination. The Appellate Court found that additional specific relief must be granted if the Mississippi Highway Patrol's employment practices are ever to pass constitutional muster. More specifically, the en banc court remanded this case "for the District Court, in the first instance, to fashion an appropriate decree which will have the certain result of increasing the number of blacks on the Highway Patrol" and adumbrated guidelines to aid this Court in complying with this requirement.

The Court of Appeals concluded that because these defendants in oral argument represented that subsequent to this Court's decree they had hired every black applicant who had met all employment qualifications, resulting in only six black patrolmen having been hired since the entry of the decree "during a period when 91 patrolmen were added to a total force of approximately 500 troopers, (400 is the correct figure) [t]hese figures alone negate the State's argument that its present [employment] practices are nondiscriminatory, and give no support whatsoever to any argument that the decree appealed from [was] sufficient to eliminate the effects of past racial discrimination." The majority of the Court of Appeals concluded that it is apparent that either the qualifications are discriminatory in effect or the State has not conducted a sufficient recruitment campaign to enlist blacks who meet those requirements. This Court was then instructed to scrutinize the DPS's recruitment procedures and hiring criteria and to order additional appropriate recruitment measures to insure that black applicants will be attracted, as well as to require that hiring criteria, including testing, should be job validated by encompassing criteria predictive of successful job performance. Stated another way, this Court must insure the application by the DPS and the Mississippi Highway Patrol of objective, racially neutral, job-related and validated employment criteria and testing procedures which are correlated to satisfactory job performance.

The Court of Appeals found it incumbent upon this Court to order affirmative hiring relief which will have the certain result of increasing the number of blacks on the Highway Patrol, but at the same time emphasized that this affirmative hiring relief need not inexorably lead to the dilution of valid employment qualifications, and that the proportion of blacks on the patrol is not required to mirror the proportion of blacks in the population of the State of Mississippi.

The Appellate Court further pointed out that in view of the protractive and pervasive discrimination practiced by the DPS and the inefficacy of the prior decree of this Court in producing a more integrated Patrol, the burden will be upon the Patrol to prove that the residual effect of past discrimination has in fact been eliminated, and that prior to the cessation of affirmative hiring programs, if any black individual challenges the Patrol's refusal to employ

him, it must show the refusal to be for legitimate, job-related reasons. This Court has also been instructed that upon completion of its scrutiny of the recruitment program and hiring criteria consistent with the principles set forth in the en banc majority opinion, we should require the DPS to fashion and submit for immediate approval and subsequent periodic review a plan which incorporates this Court's mandates; and that the plan to be submitted and ultimately enforced must be one "that works and works now to eliminate discriminatory hiring policies and eradicate their existence."

This Court has requested, received and studied proposed plans and decrees from the plaintiffs and defendants and held several conferences and hearings herein at which the parties were permitted to introduce evidence and make arguments.

It is apropos to point out that on May 15, 1974, by written order we denied the defendants' Motion for a Stay of Proceedings pending their Petition for Writ of Certiorari as well as the plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction to restrain the defendants from swearing in an all-white highway patrol class consisting of fifteen recruits who had completed training. However, the defendants were restrained and enjoined from conducting any additional Patrol recruit training classes and from offering employment to or employing any additional personnel in any position in the DPS or MHP pending further order, except in an emergency, and then only with permission of this Court after a properly noticed petition-application and hearing. The order further required the defendants to submit within thirty (30) days a comprehensive plan providing for affirmative hiring which conformed to the requirements and guidelines set out in the opinion of the Court of Appeals and permitted the plaintiffs to submit proposed modifications or revisions of that proposed plan; and we ordered the plaintiffs to submit pleadings, affidavits and other evidentiary materials on the award of attorneys' fees for the filing, preparation and trial of this case, its previous appeal and further proceedings subsequent thereto. The foregoing order was fully complied with by the parties.

The post-remand evidentiary hearing held on September 12, 1974 revealed that at that time there was a total of 910 employees of the DPS, which includes the MHP as well as the newly created Bureau of Narcotics, composed of 884 whites and 26 blacks. Of this total, there were 576 sworn officers in the MHP, four of whom were black, 368 of whom were highway patrolmen in the enforcement division and 47 all-white supervisors. Of the 42 employees in the Bureau of Narcotics, 28 were agents and 14 were support personnel. Two of the 42 were black, one being an agent and the other a clerical worker. Of the 26 unsworn black employees in the DPS, 15 performed menial jobs, e. g., janitors or cooks, and 11 held clerical positions. The reason that there were only 4 black patrolmen at that time, compared to the 6 referred to by the Court of Appeals in its en banc opinion, is that of those 6, 5 were actually employed and on duty while one was in training school, and the trainee was dismissed from school on the unanimous recommendation of the training staff, and one of the remaining 5 had been indefinitely suspended because he pled guilty to charges of resisting arrest and the use of profanity in public, although two other charges against him, assault on an officer and driving under the influence, were dismissed after he refused to take an intoximeter test. In addition, he is alleged to have discharged his weapon in public while off duty. Also, the DPS, including the Highway Patrol, has been under injunction from this Court not to hire any employees other than the 15 who had given up their other jobs and completed the training class prior to this Court's last imposed injunction.

Seventy-three (73) blacks and ninety-six (96) whites have applied for jobs, been processed, and are eligible for being tested mentally and physically to become members of the MHP. Of the 73 blacks, 40 are new applicants and 33 are those who have previously taken and failed the Army General

Classification Test (A.G.C.T.) and are again eligible to be tested. Of the 96 white applicants, 71 are new and 25 have previously failed the A.G.C.T. and are eligible to again be tested. These previously unsuccessful applicants have already been notified by mail that they again are eligible to be tested. Approximately 64% of the white applicants who took the A.G.C.T. passed while only 13% of the blacks made passing grades. The average number of Highway Patrolmen performing law enforcement duties during the last several years has been approximately 368 to 380, and approximately 28 to 30 are hired each year in order to replace those who resign, retire or terminate for other reasons. The number of new employees hired each year by the entire DPS depends on the annual budget which is set by the Mississippi Legislature and signed into law by the Governor.

This Court is in agreement with Judge Coleman's observation in his dissenting opinion that "[t]here is nothing in this record to suggest that Mississippi is so bereft of Negro high school graduates and college trained persons that it has no adequate pool of qualified individuals for highway patrol service." 491 F.2d at 1062. Plaintiff's counsel stated his agreement therewith during the September 12, 1974 post-remand hearing.

As a result of the several hearings and conferences conducted by this Court subsequent to the remand of this case, the litigants have commendably reached agreements on the necessary recruiting measures to be undertaken by the DPS in order "to increase the flow of qualified minority applicants", as well as on the institution or use of the International Association of Chiefs of Police Applicants Selection Test (which is fully described in Exhibit D–3 admitted at the hearing of September 11, 1975) to applicants for the position of sworn highway patrolmen, subject to the proper validation thereof, i. e., confirming job analyses and validation studies within one year from the date of the first use thereof, utilizing the validation proceedings described in Exhibit D–4 admitted at the above hearing. The validation studies shall conform to the EEOC's Guidelines on Employee Selection Procedures, and the procedures and results of each such study shall be reported to this Court with a copy sent to plaintiff's counsel upon completion thereof. The foregoing recruitment and testing procedure agreements are fully set forth in this Court's Supplemental Decree dated September 23, 1975, agreed to by the plaintiffs and defendants, which shall be incorporated either verbatim or by reference in the "Second Supplemental Decree" which shall be entered herein in conformance with this Opinion.

The plaintiffs challenge as racially discriminatory the statutory laws of the State of Mississippi which require that applicants for the position of a Mississippi Highway Patrolman must possess a high school education or its equivalent. It is undisputed that the patrol accepts a GED completion certificate in lieu of a high school diploma. The plaintiffs contend in their Memorandum of Law filed in support of their Motion for Supplemental Injunctive Relief and Proposed Decree that based upon 1970 census data half of the white residents of Mississippi completed more than 12.1 years of school and half of the blacks have not completed more than 7.5 years of school; that 52.6% of Mississippi whites 25 years old and over have completed a high school education whereas only 15% of blacks and other races 25 years of age and over have a high school diploma; that 49.2% of Negro males between the ages of 20 and 49 years of age have not completed high school whereas only 15% of white males between the ages of 20 and 49 years have not done so, and rely on *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974) to support their contention that Mississippi's statutory educational requirement has a racially discriminatory impact and thus is unconstitutional.

No statistics have been cited to this Court and we are unable to find any which accurately reflect the percentages of white males and black males in Mississippi between the ages of 23 and 36 who are thus

qualified by age, Miss.Code Ann. § 45-3-9 (Supp.1975), to become members of the patrol and who have a high school education or its equivalent (which is and has been equated to the statutory educational requirement). In any event, this Court takes judicial notice of the fact that within the last ten years and at the present, blacks have the same educational opportunity as whites in Mississippi and hopefully and apparently are taking advantage of this once denied right which has now been secured for them. Furthermore, this Court is confident that a quality high school education is equally obtainable by blacks and whites in this State. Certainly, there has been no showing in this record that this educational requirement has produced a racially discriminatory impact by denying blacks the right to apply for or become Mississippi Highway Patrolmen, such as was found to exist by the Court in *Johnson v. Goodyear Tire & Rubber Co., supra.*

The majority of the en banc Court of Appeals emphasized that the imposition of affirmative hiring relief need not inexorably lead to the dilution of valid employment qualifications, and this Court, as did Judge Clark in his concurring opinion, does not understand the majority opinion to require such as an adjunct of achieving the required integration. In *NAACP v. Allen,* 493 F.2d 614 (5th Cir. 1974), the Court stated: "It is also significant that the hiring qualifications defined by the DPS will not have been compromised pending the contemplated validation studies." 493 F.2d at 621. Certainly the sophisticated, sensitive and vitally important function of highway patrol officers in the State of Mississippi is the performance of general law enforcement duties including the handling of emergency situations, preserving human life on the highway, preparing reports, investigating collisions, assisting local law enforcement officers in many types of investigations, working with the Bureau of Narcotics and other investigatory bureaus and testifying in court. All of the foregoing duties require learning, education, judgment and ability in serving a compelling state interest.

The plaintiffs failed to offer any evidence, other than the above statistics, in support of their attack upon this educational qualification prerequisite to a person becoming a patrolman. On the other hand, the defendants' witness, Jim Terry, Test Technician for the Mississippi Classification Commission since 1973, testified at the September, 1974 hearing that Dr. Betty Gaulden, Professor at the Reading Center at predominantly black Jackson State University, conducted a test which revealed that a reading grade level average of 11.2 years is required for a person to read and understand the seven basic training textbooks used at the Mississippi Highway Patrol training academy, and that although there was no correlation between ability to read these texts and job performance, certainly there is a correlation between the test results and the ability to read training manuals which the Patrol considers necessary to adequately train their patrolmen in the basic fundamentals of the job required of them. Terry further testified that a 1972 survey made by the International Association of Chiefs of Police (IACP) published in a 1973 report entitled "Police Personnel Practices in State and Local Governments" concludes that based upon responses from state, county and local governments concerning selection standards and educational requirements, the average requirement of a police officer was a 12th grade education. A U. S. General Printing Office publication entitled "A National Strategy To Reduce Crime" recommends that one year of college be immediately required as a condition of initial employment for a police officer, and that by 1983, completion of at least 4 years of college level education or a baccalaureate degree be required. This G.P.O. publication states that the high school diploma requirement is 40 years old and thus outdated, because today and in the future, emphasis is on professionalism and expertise. (Ex. D–1) In a document entitled "Comparative Analysis of Standards and Goals of the National Advisory Commission on Criminal Justice Standards and Goals with Standards For Criminal Justice of the American Bar Association", the ABA rec-

ommends that college graduates be encouraged to apply for employment with public agencies and espouses the gradual institution of requirements for the completion of specified periods of college work as a prerequisite for initial appointment and promotion. (Exhibit D–2). Also, in his 1959 book entitled "A Forward Look in Police Education" Thomas Frost states on page 170 that it would appear that a police officer should be a high school graduate or its equivalent.

In view of (1) the foregoing authorities, (2) that we are here dealing with law enforcement officers whose qualifications are vital to the proper discharge of their all important duties to protect public life and property, (3) that all of the states within the Fifth Circuit require their highway patrolmen to have a high school education or its equivalent, except Texas, which requires 45 semester hours of college (See Judge Coleman's dissent in the en banc case decision), (4) that the States have not only the right, but the duty, to prescribe the qualifications of their law enforcement officers which are racially neutral and capable of being carried out with no racial discrimination whatsoever, and (5) the absence of any showing of a racially discriminatory impact on minority races in the State of Mississippi by this reasonable and modest statutory educational qualification requirement which applies to all races, this Court is of the opinion that this requirement is not racially discriminatory, bears a demonstrable and significant relationship to successful performance of the job of a Mississippi Highway Patrolman and in no way violates the constitutional rights of minority races, but rather, serves a compelling state interest.

We now turn to the question of whether the Fifth Circuit's Mandate to this Court requiring us to fashion an appropriate decree which will have the certain result of increasing the number of blacks on the Highway Patrol dictates or necessitates a temporary quota hiring system, or phrased differently, a racial hiring ratio.

Plaintiffs contend that this Court should require the MHP to employ two black patrolmen for each white patrolman until ap-proximately 35% of the sworn officers of the MHP are black, and impose the same hiring requirement on the DPS for other non-sworn personnel. They contend that since an average of only 28 to 30 new patrolmen are employed each year, it is necessary that an average of 18 qualified blacks be employed every year to achieve the above percentage goal within 6.8 years, and argue that the only certain way of complying with the Fifth Circuit's mandate of increasing the number of blacks on the Patrol is through a temporary quota hiring.

Initially, it is observed that the Fifth Circuit held that beyond insuring that objective hiring criteria are utilized to achieve "the certain result of increasing the number of blacks on the Highway Patrol" that "it will be incumbent on the District Court to order some affirmative hiring relief". The Court then went on to state: "It *may*, within the bounds of discretion, order temporary one-to-one or one-to-two hiring, the creation of hiring pools, or a freeze on white hiring, *or any other form of affirmative hiring relief* until the Patrol is effectively integrated". (emphasis supplied). The Court emphasized, however, that the imposition of affirmative hiring relief need not result in the proportion of blacks on the Patrol mirroring the proportion of blacks in the population. 491 F.2d at 1055–56.

In the later case of *NAACP v. Allen, supra,* the Fifth Circuit stated that "The scope of the district court's discretionary equitable powers is broad, and the nature of the relief it prescribes is inherently flexible. The remedy it decrees, however, must be feasible, workable, effective (citations omitted), and promise realistically to work and work now". 493 F.2d at 617. The *Allen* Court went on to say that "It is the collective interest, governmental as well as social, in effectively ending unconstitutional racial discrimination, that justifies temporary, carefully circumscribed resort to racial criteria, whenever the chancellor determines that it represents the only rational, nonarbitrary means of eradicating past evils." 493 F.2d at 619. Even more significantly, the Court stated, "We again caveat that quota relief does not seek to confer proportional

representation in public employment upon any minority or identifiable ethnic group, and that no individual or group has a right to be represented in any particular public program or body. The Constitution only warrants the right of equal availability to and even-handed dispensation of public benefits. Traditional concepts of comity and judicial restraint must also guide the discretion which chooses to use the *drastic remedy of quota hiring. It is a form of relief which should be reserved for those situations in which less restrictive means have failed or in which the chancellor could reasonably foresee that they would fail.*" (emphasis supplied). 493 F.2d at 621. *Cf. Chance v. Bd. of Examiners and Bd. of Education of City of New York*, 496 F.2d 820, 44 U.S.L.W. 2343 (2nd Cir. 1976) (constitutionally forbidden reverse discrimination).

■ This Court is of the opinion that this case is one in which the drastic remedy of quota hiring is not dictated or necessary *at this time* ; rather, in view of the other affirmative hiring relief prescribed herein, the more extensive recruiting program and the administering of a now agreed-upon job related test, it is reasonably foreseeable that an increase in the number of blacks on the MHP and in the DPS as a whole will be immediately effected. The DPS will be ordered to submit to this Court a plan which effectuates the requirements set forth in this Opinion and to immediately implement that plan with a view of achieving the required result now.

■ In order to insure that the Fifth Circuit's mandate is complied with and that the defendants will in good faith comply with the dictates of this Court contained herein, which will be incorporated in a Supplemental Judgment or Decree, in addition to requiring the defendants to compile and retain extensive records, as well as to make periodic reports to this Court to insure that no duly qualified black person has been denied a job because of race, we will further require the defendants to ask leave of this Court to conduct training school classes for those who successfully pass the agreed

testing and to hire those successfully completing the training school. When these requests are made by appropriately noticed motions after a full hearing in which the defendants will have the burden of proof, this Court will act thereon. We shall scrutinize all of the statistical records, documents and other evidence offered in support of the defendants' motions in order to determine whether the relief granted herein suffices to achieve the necessary goal.

■ As suggested by Judges Roney, Bell and Ainsworth in their specially concurring opinion, when hiring future employees or officers, the MHP shall be temporarily required to first offer appointment to every black applicant who meets the minimal qualifications which this Court has determined to be valid, i. e., (1) passes the approved test, (2) meets the statutory educational requirement, (3) passes the physical examination and successfully completes training school, (4) passes the Patrol's standardized background investigation. This requirement shall remain in effect until this Court, upon appropriate motion, determines that a sufficient number of blacks have been appointed to overcome the effects of the past discriminatory employment practices of the Patrol. This temporary hiring requirement shall be applicable to all sworn officers of the DPS with the exception of the Mississippi Bureau of Narcotics, as will be explained hereinafter.

■ It is not the desire of this Court to supervise the operation of the DPS or the MHP, because within constitutional and statutory limits, these matters are within the province of the State governmental officials. See e. g., *Rizzo v. Goode, et al.*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, U.S.L.W. 4095 [1976]. However, we have the obligation to insure that in the formulation and implementation of policies and procedures for the hiring of employees of the DPS that constitutional and statutory guarantees are not violated and that the mandate of the Court of Appeals is complied with.

We next consider the question of hiring non-sworn support personnel by the DPS

and the concomitant testing or qualifications thereof. At the September 11, 1975 hearing, evidence was presented concerning testing for the following non-sworn support personnel positions: accounting clerk, clerk, clerk-typist, computer data entry operator, computer systems operator, programmer, secretary, stock clerk, and testing clerk. The entrance examinations or tests for these positions are in two parts; first, the applicant is required to pass a written examination covering such areas as reading, mathematical ability, etc.; then, the applicant must pass a proficiency examination which tests his skills in areas such as typing, shorthand, or use of a dictaphone, as required for the various positions.

Mr. Terry testified at this hearing with reference to the manner in which these tests were constructed. The tests were developed by him as composites of examinations marketed by the International Personnel Management Association; he has conducted content validity studies for the written tests, but no such studies have been conducted on any of the proficiency or performance tests. The conducted content validity studies of the written examination involved job analysis interviews with one employee from each department, none of whom were minority employees, and a review of the analysis with the supervisor of the department, but the study made no attempt to determine the level of each skill required for the various job positions.

The Classification Commission Test Validation Study (Exhibit D–5) submitted in support of the nondiscriminatory effect of these tests reveals them to be somewhat suspect. Although very few applicants of any race failed the written test, the average score for blacks taking these tests is lower than that for whites, and the ranking of applicants to some extent depends upon their test score.

The content validity study totally omits any consideration of the proficiency tests. It is noted that of fifteen minority applicants taking the typing proficiency test, six failed; on the other hand, of one hundred white applicants taking the test, only twenty-three failed, and an even higher percentage of blacks than whites failed the dictaphone and shorthand tests.

■ This Court's original Opinion in this matter, *Morrow v. Crisler,* No. 4716 (S.D. Miss., filed Sept. 29, 1971), as well as the two Fifth Circuit Opinions, *Morrow v. Crisler,* 479 F.2d 960 (5th Cir. 1973), 491 F.2d 1053 (5th Cir. 1974), *cert. den.,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), concluded that there was a pattern of past racial discrimination by the DPS in hiring both sworn and unsworn personnel (with the exception of the Bureau of Narcotics, which was not attached to the DPS at that time). Therefore, any entrance examination to be utilized by the defendants in the hiring of non-sworn personnel must be shown to be nondiscriminatory by being properly validated. *See, e. g., Hester v. Southern Rwy. Co.,* 497 F.2d 1374 (5th Cir. 1974).

■ The Court has previously found Mr. Jim Terry to be qualified as an expert in the field of employment testing. He has an undergraduate degree and has done graduate work in this field and has worked in this area for approximately three years with the Mississippi Classification Commission, including performing content validity studies. Therefore, we find that he is qualified to conduct a content validity study. However, the tests conducted to date are inadequate to validate as nondiscriminatory the employment tests now being administered. We have pointed out the deficiencies in job analysis and skill level connected with the study of the written examination, and we have also pointed out that no validation has been performed on the proficiency test. Therefore, while we will permit the DPS to begin using its present entrance examinations in the hiring of non-sworn personnel, we will require that the department immediately undertake a new validation study for both the written and proficiency examinations, modifying each if the results of the study so indicate. 29 C.F.R. 1607.9. In conducting the study, the department should give great deference to the EEOC's *Guidelines on Employee Selection Procedures,* 29 C.F.R. 1607. In particular, wher-

ever possible, the job analysis portion of the study should include (1) interviews with minority employees and with at least three employees in each position; (2) an analysis of the skill level necessary for each job; and (3) all tests used by the department, including proficiency tests.

The results of this validity study shall be presented to the Court within seven months, at the time of the second employment report required hereinafter, and in doing so, deference should be given to the form of presentation suggested in the EEOC's *Guidelines on Employee Selection Procedures.* Continued use of these employment tests by the defendant will depend on the Court's approval of the results of the validation study at that time.

■ As in the case of sworn officers, when hiring future non-sworn clerical employees, the DPS shall be temporarily required to first hire every black applicant who meets the minimal qualifications which this Court has set forth herein. This temporary hiring requirement shall apply to all non-sworn clerical employees of the DPS with the exception of the Mississippi Bureau of Narcotics and shall remain in effect until this Court, upon appropriate separately noticed motion, determines that a sufficient number of blacks have been hired to overcome the effects of the past discriminatory employment practices of the DPS with respect to non-sworn clerical personnel.

■ In accordance with the Fifth Circuit's Opinion, the burden will be on the DPS and the MHP to prove that the residual effect of past discrimination has in fact been eliminated, and if any black person challenges the defendants' refusal to employ him, the burden shall be on the defendants to show that such refusal was for legitimate, job-related reasons.

The defendants shall within thirty (30) days from the date of this Supplemental Opinion, and every six months thereafter, file with the Court, and serve copies upon counsel for the plaintiffs, a report showing by race and sex:

(a) The number of employees in each department, division, and bureau of the Highway Patrol and the Department of Public Safety and in each job category within each such department, division, and bureau, and for patrolmen and sworn personnel, in each geographic division;

(b) The number of employees in each department, division, and bureau and each job category, and for sworn personnel, each geographic division, who were hired directly as new employees and the number who were terminated (voluntary or involuntary) and the reasons therefor;

(c) The total number of vacancies in each department, division, and bureau occurring during the reporting period in each job category;

(d) The number of employees in each department, division and bureau and each job category who were promoted or transferred during the reporting period;

(e) The number of applications received for patrolman positions and for non-sworn positions in each department, division, and bureau and for each job category of the Highway Patrol and the Department of Public Safety; and

(f) The number of recruit patrolmen enrolled at the beginning of each recruit training class commenced during the reporting period and the number of recruit patrolmen graduated from each recruit training class completed during the reporting period.

In addition, the defendants shall retain the following records which will be made available to plaintiffs or their representatives for inspection and copying on reasonable notice and at reasonable times:

(a) A list of all minority organizations and schools contacted for recruitment purposes showing the date of each contact, persons contacted, and name and race of defendants' representative who made the contact;

(b) Copies of all advertisements for employment purposes made by defendants in newspapers or radio stations directed pre-

dominantly toward black communities; the dates of each such advertisement, and the name of each newspaper or radio station used;

(c) A list of all applicants for employment made to defendants showing the applicant's name, race, sex, referral source, work history, educational background, date of application, position applied for, and action taken on the application;

(d) Records showing the date administered, name, and nature of each test, including skill tests, administered after the date of this decree, the name, race and sex of each person tested, and the score received by each person so tested;

(e) Copies of all applications for employment received by defendants.

The defendants shall be required to keep contemporary written records of the specific reason or reasons for each decision not to hire any black applicant for a position with the DPS and the MHP. These records shall be maintained at the headquarters of the DPS at Jackson, Mississippi and be available for inspection after reasonable notice and at reasonable times by any rejected black applicant and/or his counsel and by counsel for the plaintiffs herein. These records shall be kept in a Minority Contacts File in the headquarters in Jackson, Mississippi, and at each substation or district headquarters of the MHP throughout the State, and will contain information regarding all contacts, inquiries and applications from black applicants or potential applicants, and the action taken on such contact, whether the applicant got an application, whether the applicant was hired, told that no positions were available, and/or to apply later. Furthermore, records should be kept in the Minority Contacts File in the MHP in Jackson concerning any black recruits or trainees who do not successfully complete the prescribed training and the reasons therefor.

We next consider what, if any, relief the plaintiffs are entitled to with respect to the Mississippi Bureau of Narcotics (the Bureau). After the commencement of this action, the Mississippi Legislature removed the Bureau from the State Board of Health and attached it to the Mississippi Department of Public Safety. Although the Bureau is attached to the DPS, it is an independent agency of the state, and the Commissioner of Public Safety has no authority over it, it does not report or account to him, there is no co-mingling of funds between the Bureau and DPS, and the Bureau's hiring procedures are completely separate and different from those of the Highway Patrol and DPS.

On October 15, 1974, the Bureau filed a Motion for Clarification in which it requested that this Court rule that it was not properly a party to this action. This Court conducted a hearing on this Motion and subsequently ruled that even though the Bureau was not specifically named in the original Complaint and was not a part of the DPS at the time it was filed, it is properly a party to this suit and should remain so until the final disposition of this matter, although not without considerable doubt or misgiving.

A consideration of all the evidence of record in this case leads us to conclude that there has been no showing of a pattern or practice of unconstitutional discriminatory hiring practices by the Bureau of Narcotics. Kenneth Fairley, Director of the Bureau of Narcotics, testified that because of the peculiar nature of its responsibilities, it is essential to the Bureau's functioning that it have a large minority representation, and it has gone to extraordinary lengths to attempt to recruit minority agents. Mr. Fairley has written letters to all of Mississippi's predominantly black colleges, junior colleges, and numerous individual leaders in the black community, stating the urgency for the Bureau to have black agents to work with the drug problem in the Negro community, asking their assistance in recruiting qualified blacks, and assuring them of the Bureau's desperate need for minority employees. On several occasions, the Bureau has issued press releases stating its desperate need for minority

agents and providing information on the procedures to apply for positions. On June 26, 1974, there appeared on the front page of the Jackson Daily News an interview with the Bureau Chief of Staff, under the headline "Plea for Applicants Urgent One for Narcotics Bureau" in which he repeatedly emphasized the Bureau's desire to employ blacks, stating, "We have a crying need for minority personnel, . . . . Particularly black females." The Bureau obtained "on loan" from the Georgia Highway Patrol a black recruiting officer, who was assigned the task of recruiting in the black community. It has placed ads in all of the major papers in the State of Mississippi emphasizing that all applicants for positions with it would be considered without regard to race, color, creed or national origin. Letters have been sent to numerous predominantly black social and political organizations, such as the Urban League, the NAACP, and the Opportunities Industrialization Center, requesting their assistance in recruiting qualified blacks.

When this Court conducted its hearing on the Bureau's "Motion for Clarification" on September 12, 1974, these recruiting efforts had paid little dividends, inasmuch as only two of its forty-two employees were blacks, and of its twenty-eight sworn agents, only one was black. The situation has now changed to some extent. At the present time the Bureau has 68 employees; of these 60 are white and 8 are minority employees. Of its 46 sworn agents, 4 are blacks and one has a "Spanish surname". It is apparent to this Court that the Bureau has from its inception made a conscientious effort to employ blacks, and above statistics of disparity in percentages does not reflect discriminatory employment practices.

■ Since we have found no unconstitutional racial discrimination by the Bureau, it does not have the burden of proving that its employment criteria are nondiscriminatory. *Hester v. Southern Rwy., supra.* We note, however, that the Bureau has two principal requirements for employment: (1) Agents must have satisfactorily completed two years of college, or the equivalent in experience, i. e., two years law enforcement experience and specialized Justice Department narcotics training is the equivalent of one year of college, and four years law enforcement experience and specialized Justice Department narcotics training equals two years of college. Miss.Code Ann. § 41–29–107 (1972), and (2) All applicants must pass a written entrance examination.

■ Due to the delicate and highly specialized nature of the Bureau's responsibilities, this Court does not hesitate to uphold the education and training requirement for agents, as it has for Highway Patrolman. The written examinations used by the Bureau were prepared for it by the International Association of Chiefs of Police (IACP) pursuant to a contract, and while the tests have not yet been validated because of the short time they have been in use, the contract requires IACP to perform validation studies on the tests, and these studies are now in progress.

■ For the foregoing reasons, the Court finds that the employment practices of the Mississippi Bureau of Narcotics are nondiscriminatory and that the plaintiffs are entitled to no relief against it.

The last remaining matter to which this Court must address itself is the question of whether the plaintiffs are entitled to recover attorneys' fees from the defendants or any of them.

In our Original Opinion and the Decree entered pursuant thereto, this Court found that the plaintiffs were entitled to recover from the defendants a $500.00 attorneys' fee, together with all costs of this proceeding, although we failed to state the basis on which we made this award. The original panel of the Fifth Circuit which heard and decided the appeal of this case affirmed the Judgment or Decree of this Court in all respects. 479 F.2d 960. After the rehearing en banc, the Fifth Circuit, in affirming this Court's finding that Mississippi DPS and MHP had historically engaged in unconstitutional discrimination in the employment of personnel, directed this Court to "reconsider the award of the amount of

attorney's fees, and . . . award such fees as may be appropriate for this appeal and further proceedings." 491 F.2d at 1057.

The defendants have from the inception of this case contended that the Eleventh Amendment bars the award of attorneys' fees against an unconsenting state and state officials acting in their official capacities, and at the first full hearing held subsequent to remand, this Court, pursuant to the request of the defendants, held in abeyance any decision concerning the award of attorneys' fees until there had been a resolution of the immunity question by the United States Supreme Court or by the en banc Fifth Circuit.

■ Although this Court has some reservation concerning its jurisdiction to now reconsider its previous award of attorneys' fees, since it does have continuing jurisdiction of this cause of action pursuant to the remand of the Fifth Circuit, we now reconsider and find that the plaintiffs are not entitled to recover any attorneys' fees from the defendants or any of them, inasmuch as our award of attorneys' fees (wherever attorneys' fees is referred to herein it also includes costs) was made solely on the basis of the "private attorney general" theory which was the rule of the Fifth Circuit at that time and prior to the United States Supreme Court's Opinion in *Alyeska Pipeline Service v. Wilderness Society, et al.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 14 (1975). In *Alyeska* the Court explicated the legal history of the "American rule" on awards of attorneys' fees—each party must bear the cost of its own attorneys' fees—and the traditional exceptions to that rule: (1) a contract between the parties; (2) a specific statute; (3) the common fund theory; or (4) cases involving willful disobedience of a court order or instances of bad faith, vexatious, wanton or oppressive conduct. 421 U.S. at 257–59, 95 S.Ct. at 1621–22, 44 L.Ed.2d at 153–54; *See also Schiff v. Williams,* 519 F.2d 257 (5th Cir. 1975).

*Alyeska* has now made it plain that it is improper for a District Court to make an award of attorneys' fees unless one of the first three exceptions is present or the award is based upon conduct by the defendants which would qualify under the fourth or "bad faith" exception.

Certainly exceptions one and three are not present. Likewise, this cause of action against the defendants is based on 42 U.S.C. §§ 1981, 1983 and 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964), none of which authorizes the award of attorneys' fees to a prevailing party, and thus exception number (2) is inapplicable.

The only remaining possible exception warranting the award of attorneys' fees is if the defendants are guilty of willful disobedience of this Court's orders or of bad faith, vexatious, wanton or oppressive conduct. We conclude that they were not. At no time did these defendants violate any order issued by this Court, but to the contrary, have attempted to fully comply therewith. The named plaintiffs herein were denied relief because of this Court's findings, affirmed on appeal, that the complained of conduct of the defendants, that is, failure to give them application forms to apply for positions of sworn members of the MHP, was not based on race, but occurred during and because of a moratorium on hiring. The sole basis for this Court's conclusion that the defendants have been guilty of unconstitutional discriminatory practices in failing to hire blacks was statistical, i. e., the absence of any black members of the MHP and only a negligible number of employees in clerical and menial positions in the DPS. The defendants' failure to utilize different and more positive recruiting methods and validated tests and other affirmative hiring criteria did not constitute bad faith or wanton or vexatious conduct. This conclusion is supported by the fact that they initially changed the type test which they were utilizing from a Standardized Generalized Intelligence Test or the Otis Quick Mental Scoring Test, to the Army General Classification Test (AGCT), which was later found to be unvalidated and thus discriminatory in nature. Furthermore, through the good faith efforts and negotiations of the defendants with the

plaintiffs, more positive recruiting measures and the administration of a test for sworn patrolmen were agreed upon, as evidenced by the Agreed Supplemental Decree entered herein by this Court on September 24, 1975. This manifests a good faith attempt by the defendants to comply with the orders of this Court and the mandate of the Fifth Circuit, and the mere fact that the parties could not agree on other aspects of this case certainly does not warrant a conclusion that the defendants were acting in bad faith. Therefore, neither the individual plaintiffs who did not prevail, see *Sapp v. Renfroe*, 511 F.2d 172, 178 (5th Cir. 1975), nor the class whom they represent are entitled to an award of any attorneys' fees.

Even assuming that we are mistaken in the above conclusion, this Court finds that the Mississippi DPS and its subsidiary or subagency, the MHP, are alter egos of the State of Mississippi, exercising governmental functions, and thus the state is the real party in interest and is immune from suit for attorneys' fees and costs by virtue of the Eleventh Amendment to the United States Constitution. *Cf. Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hall v. Issaquena County Bd. of Supervisors*, 526 F.2d 711 (5th Cir. 1976); *Newman v. State of Alabama*, 522 F.2d 71 (5th Cir. 1975).

Likewise, the Eleventh Amendment prohibits the award of attorneys' fees and costs against state officials acting in their official capacities. In any event, it would be unjust to hold those presently in authority monetarily liable for the transgressions of their predecessors, as is recognized by the dissenting opinion in *Newman v. State of Alabama, supra*, at 79.

For the foregoing reasons and each of them, the plaintiffs' prayer for an award of attorneys' fees against the defendants and each of them will be denied, with each side to bear its own costs.

A "Second Supplemental Decree" dissolving the injunction now in effect herein and effectuating the foregoing Findings of Fact and Conclusions of Law, and enjoining compliance therewith, shall be presented to this Court, approved as to form by counsel for both sides, within the time and in the manner prescribed by the Rules of this Court.