Marcus **AGUILERA**, Plaintiff-Appellant,

v.

**COOK COUNTY POLICE AND CORRECTIONS MERIT BOARD,** Defendant-Appellee.

No. 84–1409.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1985.

Decided April 30, 1985. Rehearing and Rehearing En Banc Denied May 28, 1985.

Alan I. Becker, Bowles, Becker & Levine, Chicago, Ill., for plaintiff-appellant.

Iris E. Sholder, Asst. State's Atty., Chicago, Ill., for defendant-appellee.

Before ESCHBACH, POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

The plaintiff, Aguilera, claims that Cook County violated Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000e, by refusing to hire him as a corrections officer (guard) of the Cook County Jail back in 1976. After earlier proceedings unnecessary to dwell on here, the district court granted summary judgment for the County, 582 F.Supp. 1053 (N.D.Ill.1984), and Aguilera appeals.

Aguilera is Hispanic, and contends that the County's requirement that its corrections officers have a high school diploma or high-school-equivalency certificate bears disproportionately against Hispanic people (defined as people who have Spanish last names). The district court was skeptical about whether the statistics that Aguilera had presented to show this disproportionate effect ("disparate impact," in the jargon of job-discrimination law) were any good, but held that in any event a high school education is a reasonable qualification for being a corrections officer. The County argues that it had other nondiscriminatory reasons for not hiring Aguilera, but we find these unpersuasive. Pursuant to an earlier order of the court, Aguilera was permitted to take the mental-ability test that is the next hurdle the applicant must jump after presenting his high school diploma or equivalency certificate— and he failed it. The County argues that since Hispanics have a higher pass rate than whites—38 versus 32 percent—the test cannot discriminate against them, and therefore provides a lawful ground for the refusal to hire Aguilera. But if the requirement of a high school education is discriminatory, the mental-ability test may indeed be a further, and discriminatory, barrier to Hispanics. Suppose (to take an extreme example) that Cook County required black people applying for positions as corrections officers to have Ph.D.'s but whites to have only high school diplomas, and suppose the pass rate on the mental-ability test was 38 percent for blacks and 32 percent for whites. The closeness of these figures would be quite suspicious, as the black applicants would be a much better educated group than the whites and ought to have a much higher pass rate. Similarly, if it is true as Aguilera contends that requiring a high school education of Hispanics imposes a more stringent qualification on them than on others because Hispanics through no fault of their own have found it difficult to obtain such an education in Chicago, the higher pass rate of

those Hispanics who do succeed in obtaining such an education does not prove that the mental-ability test is not also slanted against Hispanics. All this is not to say that Aguilera has proved that either the educational requirement or the test has a disproportionate impact on his group; but he has put in enough evidence to withstand summary judgment on the ground of no impact.

■ The County also points out that Aguilera had a significant criminal record. Quite possibly it would not have hired anyone with such a record. But this is a contested question of fact and therefore cannot be resolved in a summary-judgment proceeding. It is not as if the County had a flat rule against employing guards with criminal records. Such a rule might be reasonable (an issue we need not decide), and if so it would be a nondiscriminatory ground for not hiring Aguilera. But the County has no such rule, and it was only after this suit was brought that it decided that Aguilera should be disqualified by his criminal record.

■ The County also argues that (as the district judge thought but did not hold) Aguilera failed even to show that the requirement of a high school education affects Hispanics disproportionately. Aguilera put in census data showing that in 1980, 70 percent of the white residents of Cook County aged 25 and older had a high school education compared to only 35 percent of the Hispanics. There is no suggestion that Aguilera picked the data to help his case. They were the only data available. The County argues that they are no good because they exclude persons 21 through 24 years old and include persons over 44, though the eligible group for appointment as Cook County corrections officers was 21 to through 44. Younger Hispanics are more likely to have completed high school than older ones, so leaving out 21 through 24-year-olds biases the census data in Aguilera's favor. But by the same token including everyone over 44 biases the census data against Aguilera; and there must be more Hispanics in Chicago above

the age of 44 than between 21 and 24. In any event the disparity between the completion of high school by whites and by Hispanics is so great that it is out of the question that more complete statistics would eliminate it. Statistics no more refined than those presented by Aguilera have often been relied on to establish a prima facie case of racially or ethnically disproportionate impact. See, e.g., *Walls v. Mississippi State Dept. of Public Welfare*, 730 F.2d 306, 315 and n. 8 (5th Cir. 1984); *Hameed v. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local Union No. 396*, 637 F.2d 506, 510–11 and n. 4 (8th Cir.1980). They were good enough to make out a prima facie case for Aguilera in the absence of any contrary statistical evidence.

■ The district court held, however, that a high school education is an appropriate credential to require of a Cook County corrections officer; and if the court could properly find, without a trial, that such a credential "bear[s] a demonstrable relationship to successful performance" of such a job, or, what we take to be the equivalent, "fulfill[s] a genuine business need," then we must affirm. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). But what exactly is the standard that we are to apply to this question? The key words in the passages we have quoted from the *Griggs* case, "need" and "demonstrable relationship to successful performance," are not synonyms; and, surprisingly, the later cases do not converge on a definite and clear standard. For example, compare *Zahorik v. Cornell University*, 729 F.2d 85, 95 (2d Cir.1984), with *Zuniga v. Kleberg County Hospital*, 692 F.2d 986, 991–92 (5th Cir.1982), and *Wright v. Olin Corp.*, 697 F.2d 1172, 1185 n. 21 (4th Cir.1982). One popular formulation—"essential to safe and efficient" conduct of the employer's business, which originated in the Supreme Court's decision in *Dothard v. Rawlinson*, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977)—seems very stringent indeed, but is not. It would be if

it just said "essential" to the employer's business or "essential to safe" conduct of the business; but "essential to ... efficient" is just another way of saying "efficient," which is pretty much the same thing as "reasonable." In any event, actions speak louder than words; and we shall see that the cases support a tolerant standard for requirements such as the one in issue here. Our circuit has been content to require "a reasonably tight fit between the challenged criterion and the actual demands of the job," *Caviale v. Wisconsin Dept. of Health & Social Services,* 744 F.2d 1289, 1294 (7th Cir.1984), and we reaffirm this formulation.

True, the Equal Employment Opportunity Commission has issued detailed guidelines for validating procedures for the selection of employees (see 29 C.F.R. Part 1607 for the current guidelines); the guidelines are applicable to educational requirements as well as to tests, see 29 C.F.R. § 1607.16(Q); and such requirements have sometimes been rejected because they had not been validated in accordance with the guidelines, see, e.g., *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 622 (5th Cir.1983). But the guidelines have never been promulgated as regulations, and do not have the force of law, see, e.g., *Guardians Ass'n of New York City Police Dept., Inc. v. Civil Service Comm'n,* 630 F.2d 79, 90–91 (2d Cir.1980); and their exacting criteria are more applicable to tests than to educational requirements. Tests are made and scored by the employer, hence easily misused; degrees are awarded by schools that are independent of the employers who use the degrees as job qualifications. *Vuyanich v. Republic Nat'l Bank,* 505 F.Supp. 224, 372 (N.D. Tex. 1980), vacated on other grounds, 723 F.2d 1195 (5th Cir.1984).

Sometimes the appropriateness of an educational requirement is sufficiently obvious to allow dispensing with empirical validation. No one would insist that a law school validate statistically the "business need" behind requiring that its faculty members have law degrees (which might, indeed, be quite difficult to do), or that a hospital validate a requirement that its doctors have medical degrees. Cf. *Rice v. City of St. Louis,* 607 F.2d 791, 797 (8th Cir.1979) (public health workers must have college degree); *Scott v. University of Delaware,* 455 F.Supp. 1102, 1124–26 and n. 64 (D.Del.1978), vacated on other grounds, 601 F.2d 76 (3d Cir.1979) (professors must have Ph.D.'s); *New York Transit Authority v. Beazer,* 440 U.S. 568, 587 n. 31, 99 S.Ct. 1355, 1366 n. 31, 59 L.Ed.2d 587 (1979) (transit employees must not be methadone users); *Garcia v. Rush-Presbyterian-St. Luke's Medical Center,* 660 F.2d 1217, 1222 (7th Cir.1981) (employees must know English). Coming closer to the facts of this case, a number of cases uphold the requirement of a high school diploma or equivalent for police officers without insisting on statistical or other validation. See *Castro v. Beecher,* 459 F.2d 725, 735 (1st Cir.1972); *Morrow v. Dillard,* 412 F.Supp. 494, 499–501 (S.D.Miss.1976), rev'd in part on other grounds, 580 F.2d 1284 (5th Cir. 1978); cases cited in 3 Larson & Larson, Employment Discrimination § 76.21(b) (1984); *Donnell v. General Motors Corp.,* 576 F.2d 1292, 1299 n. 16 (8th Cir.1978) (citing cases); cf. *Walls v. Mississippi State Dept. of Public Welfare, supra,* 730 F.2d at 316–17 (clerk/typists). But see *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1181–82 and n. 32 (5th Cir.1976), which requires that the employer show that he "has no other choice." *Id.* at 1181. *Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810, 815 (8th Cir.1983), uses somewhat similar language—but also upholds an educational requirement without insisting that it be shown to be strictly necessary. Neither *Watkins* nor *Hawkins* involved law-enforcement personnel.

■ It is an ideal of our profession, if all too often an unattainable one, to make law certain; and there has now been enough judicial and professional experience with educational requirements in law enforcement to establish a presumption in civil rights cases that a high school education is an appropriate requirement for anyone who is going to be a policeman, or, we add, a

corrections officer (jail or prison guard), and therefore to excuse civil rights defendants from having to prove, over and over again, that such requirements really are necessary for such jobs. It is true that the previous cases involved policemen rather than corrections officers. But if policemen face a special challenge in dealing in varied circumstances with members of the general public, corrections officers face as great a challenge in handling the most volatile, dangerous, and unsocialized element of the community—the jail and prison population. Like policemen, corrections officers are exposed to the constant threat of civil rights suits, which indeed are brought in greater number against them than against policemen. (Almost 19,000 federal civil rights suits were filed in 1984 by prisoners, mainly state prisoners. See Table C 2 in the 1984 Annual Report of the Director of the Administrative Office of the U.S. Courts.) They had better have the educational background necessary to grasp at least the rudiments of modern constitutional law, which are not intuitive.

Cook County corrections officers must undergo 10 weeks of training, which includes courses on correctional law at Chicago city colleges. Successful completion of this training entitles an officer to 12 hours of college credit. Since completion of high school is ordinarily a requirement for admission to college, it is reasonable to require a high school diploma or equivalent as an entrance requirement to a program which includes college-level training—and Aguilera does not question the appropriateness of making that training mandatory. He could not. "Corrections has become an increasingly complex and demanding field. The skills, knowledge areas, attributes and personal characteristics required of correctional officers have also become increasingly complex and demanding, and considerably different from those required of law enforcement personnel. Correctional officers must be able to interpret and implement court decisions relating to due process and disciplinary matters, and have an understanding of operational security. Also, they must be able to interpret and

assist in the management of inmate behavior over long periods of time under the conditions of confinement." American Correctional Ass'n, Standards for Adult Local Detention Facilities 14 (1981). Uncontested documents in the record of this case describing the training and jobs of Cook County corrections officers indicate that the quoted description is applicable to these officers.

Since the appropriateness of requiring college-level training of Cook County corrections officers is conceded, perhaps no more need be said to "validate" the requirement of a high school education—the usual prerequisite, as we have seen, to such training. Cf. *Washington v. Davis*, 426 U.S. 229, 250 (1976). But we need not rest on this point. A recent survey found that 31 of 49 responding states impose such a requirement on their state corrections officers (though in several it is possible to substitute comparable work experience). See *Correctional Officer Hiring Policies*, 9 Corrections Compendium 7–10 (Jan.1985) (page 1 of this compendium says 23 states, but that is a miscount of the actual survey results). Half of those states that do not require a high school education require a written test, which as we have said is more vulnerable to charges of discrimination. Our own experience as federal judges who must frequently, though at one remove, deal with problems of state and local jails and prisons suggest the wisdom of such a requirement, though of course it is no business of ours whether those states that do not impose such requirements are making a mistake (some impose seemingly more formidable entrance requirements in other forms). Professional opinion is divided on the question, though the weight of opinion is strongly in favor of educated corrections officers. Compare American Correctional Ass'n, Manual of Correctional Standards 174 (3d ed. 1966); Eaton & Amir, *Manpower Strategy in the Correctional Field*, in Manpower and Training for Corrections 71, 73 (Prigmore ed. 1966); Singer & Statsky, The Criminal Process: Sentencing and the Pris-

on 504 (1974), and Wicks, Guard! Society's Professional Prisoner 35 (1980), with Gilbert, *Hiring the Entry Level Correctional Officer: A Question of Effectiveness in Predicting Future Performance—An Overview,* at pp. 51–52 (1983, unpublished report prepared for the American Correctional Association). States with serious crime problems, such as California, Illinois, and New York, require a high school education for their corrections officers; and Cook County has the largest crime problem of any county in Illinois.

■ Although the record does not contain sworn evidence that the requirement of a high school education is "job-related," which is the kind of evidence conventionally presented in summary-judgment proceedings, see Fed.R.Civ.P. 56(e), the presumption which we derive from the previous cases that requiring law-enforcement officers to have a high school education is appropriate, here reinforced by the literature we have reviewed concerning the needs and practices in the selection of corrections officers around the nation, by the documents of record concerning the training and responsibilities of Cook County Jail guards, and by the requirement—not challenged as unreasonable—that such guards undergo college-level training, taken all together, more than sufficed to prevent the plaintiff from simply resting on his complaint. Sworn testimony is not the only basis on which summary judgment may be granted; "the court may consider any material that would be admissible or usable at trial." 10A Wright, Miller & Kane, Federal Practice and Procedure § 2721, at p. 40 (2d ed. 1983) (footnote omitted). Aguilera had to put in some evidence to oppose a motion for summary judgment so massively supported (albeit not by affidavits or other sworn testimony). He put in none. He asks us to order a trial the outcome of which is a foregone conclusion.

The judgment for the defendant is AFFIRMED.